## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | |
|---|---|
| **JAKARRIS HARPER #109891** | **CASE NO.  5:19-CV-00587 SEC P** |
| **VERSUS** | **CHIEF JUDGE S. MAURICE HICKS, JR.** |
| **CADDO CORRECTIONAL CENTER, ET AL.** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

### REPORT AND RECOMMENDATION

Pro se Plaintiff Jakarris Harper ("Harper"), proceeding in forma pauperis, filed the instant civil rights Complaint pursuant to 42 U.S.C. §1983 on May 6, 2019, and Amended Complaints on July 9 and 30, 2019, and April 17, 2020.  [docs. # 1, 9, 11, 29].

Harper is a pre-trial detainee incarcerated at the Caddo Correctional Center ("CCC"), Shreveport, Louisiana.  Harper filed suit against the Caddo Correctional Center, Sergeant Zachary Thomas, Deputy Samuels, then-Deputy Demario Malone, the Special Investigations Unit, Captain Farris, Steve Prator, Commander Wyche, and Sergeant Englade.  After pre-trial proceedings, Harper's claims against all Defendants other than Deputy Thomas and Sergeant Malone were dismissed.

The District Court referred the case to the undersigned for a *Flowers* hearing,[1] which was held on July 26, 2021. [doc. #s 70, 71 & 87].  Before the court is a motion for judgment on partial findings (incorrectly raised as a motion to dismiss) which was orally made during the

---

[1]*See Flowers v. Phelps*, 956 F.2d 488 (5th Cir.), modified in part on other grounds, 964 F.2d 400 (5th Cir.1992).  A *Flowers* hearing "amounts to a bench trial replete with credibility determinations and findings of fact." *McAfee v. Martin,* 63 F.3d 436, 437 (5th Cir. 1995).

*Flowers* hearing by Defendants following Harper's presentation of his case and re-urged at the conclusion of the case.

For the reasons explained below, it is recommended that the motion be **GRANTED**, and judgment be entered in favor of Defendants, or, alternatively, based on the entire record, Plaintiff's claims be dismissed, and judgment entered in favor of Defendants.

## I. BACKGROUND

Harper filed this § 1983 action against then-Deputy (now Corporal) Demario Malone ("Malone") and Sergeant Zachary Thomas ("Thomas"). [doc. #1]. In his Amended Complaint, Harper alleged that he and Malone had a verbal altercation whereby Malone spoke to Harper with "profanity and obscene language," and made threats that he would have another inmate physically assault Harper. *Id.* Harper claimed that Thomas was present for the verbal altercation and failed to stop Malone from acting on his threats.[2] [doc. #9].

Further, Harper alleged that Malone followed through on his threats because later that day, he was attacked by a fellow inmate, Jeremy Rachal ("Rachal"), who had somehow escaped from his cell. [doc. 1]. During the attack, Rachal allegedly told Harper that he was carrying out a hit for Malone. [doc. #1-3].

As a result of the attack, Harper alleged that he suffered several injuries, including cuts and bruises and a head injury which, he contends, resulted in severe headaches and some loss of vision. [doc. #9]. He also contends that he has "new found blood pressure" problems after the attack. [doc. #11]. Harper contends that Malone's alleged orchestration of this attack, and Thomas's failure to intervene despite having knowledge of it, constitute a violation of his Fourteenth Amendment rights. [doc. #29].

---

[2] Harper's original Complaint was amended three times. [doc. #s 1, 9, 11 & 29].

Malone and Thomas deny the allegations against them.

## II.    FACTUAL FINDINGS

During the evidentiary hearing,  Harper presented his own testimony, as well as that of fellow inmates, Christopher Sanders and Todd House.  Defendants Thomas and Malone presented testimony in their defense and testimony from CCC employee, Sergeant Michael Taylor.

### A.  Undisputed Evidence

The undersigned finds that the following facts are undisputed:

There are two segregation units at CCC.  One such unit is the Disciplinary Segregation unit or "D-Seg."  Another unit is the Administrative Segregation unit or "A-Seg." Inmates in A-Seg are placed in there until administrative proceedings are complete.  Inmates found to have committed disciplinary violations may be moved to D-Seg.  The A-Seg and D-Seg units are directly across from each other, but are separated by electronic doors, which can only be activated from inside the deputy's control booth. [doc. #61].

On April 18, 2019, Malone and Thomas were assigned to the A-Team shift, which ended at approximately 7:30 a.m.  Time-stamped documents confirm that they ended their shift and left the building.

Some time after Malone and Thomas left CCC, there was at least one time that a door between the units was checked.  A deputy documented that around 9:45 a.m. the door was unsecured, and the door was checked and determined to be functioning.  [doc. #89-1, Exhibit C].

On or about 5:11 p.m. on April 18, 2019, during C shift, Harper was out of his cell in the recreation area alone and fully restrained.  He was being observed by Deputy Kaylee Fertal (then known as Kaylee Wright), who was working in the control room.  Rachal entered D-Seg by way

of the door connecting to A-Seg and then struck Harper.  Harper does not contend that Fertal

opened the doors or engaged in any wrongdoing.  In fact, he submitted her sworn statement as

part of his case that she did not conspire with other officers to release an inmate.[3]

### B.  Testimony of Christopher Sanders

Harper presented testimony from Christopher Sanders, a DOC inmate currently

incarcerated at CCC, serving terms of imprisonment on second-degree battery and drug

distribution convictions.  Sanders testified that on April 18, 2019, he was in the cell next to

Harper in D-Seg when he heard Malone "threaten[]" Sanders that he would "get [him] touched."

He further testified that Thomas was present when the verbal altercation took place.

Sanders was also in D-Seg when Harper was attacked by another inmate whom he

identified as Rachal.  Sanders testified that Malone and Thomas were not working or present at

CCC at the time of the attack on Harper and that Rachal "carded" the door to get from the A-Seg

to D-Seg.

During cross-examination, however, Sanders admitted that he filed a grievance against

Thomas on the same day of the Harper incident, alleging that Thomas threatened him and that

Malone knew of Thomas' threat against him, but failed to protect him.[4]

### C.  Testimony of Todd House

Harper presented testimony from Todd House, a DOC inmate currently incarcerated at

CCC.  House testified that on April 18, 2019, he was housed in cell 5 of the D-Seg unit.  He

---

[3] Fertal was ill on the day of the evidentiary hearing, but her sworn statement was offered by Harper in lieu of testimony.  No party objects to the admission of the statement or its use by the Court.

[4]In other words, Sanders made the same allegations that Harper made, but with a reversal of the roles of Thomas and Malone.  Sanders alleged that **Thomas** threatened him, and Malone failed to report the threat or protect him while Harper alleged that it was **Malone** who threatened him and that Thomas failed to protect him.

recalled that Harper and Malone "had words," but he does not remember what was said. He could not recall what sergeant worked that shift with Malone.

House further testified that he remembered Harper's attack. He had been brushing his teeth and heard an altercation. When he came out, House saw that Harper was being beaten and punched. House thought the inmate who attacked Harper had "fixed" or carded the door, so he could come through from A-Seg to D-Seg when he wanted to.

### D. Testimony of Harper

Harper testified on his own behalf. Harper has two prior convictions for burglary, but is now a pre-trial detainee on charges of second degree murder, attempted second degree murder, attempted armed robbery, and illegal use of weapons. He has a history of altercations at CCC.

On April 18, 2019, Harper was housed in D-Seg. According to Harper, he asked Malone to "do something" for him, and they got into a verbal altercation. As a result, Harper says that Malone threatened him, telling him that, because of his position, he could get Harper "touched." Harper further testified that Thomas was present when these statements were made.

After Malone and Thomas left the facility, Harper was attacked by Rachal while he was in the recreation room. He admits, however, that there were issues with the doors being "carded" by inmates until the locks were changed.

Harper was checked out by medical staff following the attack by Rachal, but he did not require transport to the hospital or further treatment at that time.

Only two days after the incident with Rachal, on April 20, 2019, Harper was involved in another fight and suffered further injuries.

### E. Testimony of Thomas

Thomas testified in his own defense. He is currently employed as a sergeant with CCC.

He has been employed by CCC for eleven years and has been a sergeant for the past four years.

On April 18, 2019, Thomas was a sergeant and was assigned to the A-Team, which meant that he worked the 11:30 p.m. to 7:30 a.m. shift.  He testified that he served a disciplinary notice (Exhibit 29) on Harper in D-Seg because he had allegedly made a threat to Malone.

Thomas did not hear Malone make any threat to Harper, and he was alone when he delivered the disciplinary notice to Harper.  Thomas testified that the door between A-Seg and D-Seg was not functioning correctly prior to this incident.  The locks were later replaced.

Although Harper suggested that Rachal could only have known that he was in the room if someone told him, Thomas testified that Rachal could have heard Harper's voice and known that he was in the room before he gained access to it and attacked Harper.

### F.  Testimony of Malone

Malone also testified in his own defense.  He is currently employed as a corporal with CCC.  He has been employed by CCC for fourteen years.

On April 18, 2019, Malone was also assigned to the A-Team, working the 11:30 p.m. to 7:30 a.m. shift.  During that shift, he worked in both the A-Seg and D-Seg units.  Some time that day, he recalls that Harper wanted him to do something.  Although he does not recall what the request was, he refused the request, and he and Harper argued.  He acknowledged the situation "got out of hand" and testified that Harper threatened him.  Following their verbal exchange, Malone prepared a threat-to-staff report  (Exhibit 29).

During the shift on April 18, 2019, Malone went through the door separating A-Seg and D-Seg approximately twelve times, but did not notice any problems with the door.  He testified that he does not know how Rachal was able to access two doors (his cell door and the door to the

6

recreation room) to attack Harper.  Although Malone does not know how Rachal knew Harper

was in the room, Harper can be seen on the video near the door, so Rachal could have heard him.

Malone left CCC at the end of his shift.  After he left, the doors would have been checked

by other CCC employees at least two times prior to Harper's attack.

### G.  Testimony of Michael Taylor

Defendants also presented the testimony of Sergeant Michael Taylor ("Taylor").  He has

been employed by CCC for over thirteen years and is currently the Compliance Coordinator.  In

that role, he ensures that CCC is in compliance with state and local guidelines, as well as serving

as the official records keeper.

Taylor testified that every employee of CCC has a badge reader that allows them to

access certain areas of the facility.  If a badge is scanned, then there is a log of the employee.

Defendants provided a computer printout of the times that Malone and Thomas were logged on

the date of the incident.  The printout confirmed that Malone and Thomas left the facility well

before Harper was attacked.

Taylor also testified that Harper can be seen on the video prior to Rachal's attack in he

"no go" zone.  Inmates are not supposed to be in that area to prevent communication from A-Seg

to D-Seg.  He confirmed that he also does not know how Rachal would have known of Harper's

presence, other than hearing him talk.

### III. LAW AND ANALYSIS

"An evidentiary hearing consistent with *Flowers v. Phelps* amounts to a bench trial

replete with credibility determinations and findings of fact."  *Adkins v. Kaspar*, 393 F.3d 559,

563 (5th Cir. 2004) (citations and internal quotation marks omitted).  It remains within the

province of the finder of fact to weigh conflicting evidence and inferences and to determine the credibility of witnesses.  *See Yarrito v. Cook*, 1995 WL 17788756 (5th Cir. June 22, 1995) (unpubl.) (citation omitted).

At the close of the presentation of Harper's evidence herein, Defendants moved to dismiss his claims.  Defendants then renewed that motion at the end of trial.

In a bench trial, "the appropriate vehicle for dismissing a case as a matter of law at the close of plaintiff's evidence is a Rule 52(c) judgment on partial findings."  *Weber v. Gainey's Concrete Products, Inc.*, 1998 WL 699047, *1 n1 (5th Cir. Sept. 21, 1998) (unpubl.) (citation omitted).  Rule 52 provides, in pertinent part,

> **Judgment on Partial Findings**.  If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

FED. R. CIV. P. 52(c).  When deciding a case pursuant to Rule 52(c), the court is not required to make any special inferences or construe the facts in the light most favorable to the plaintiff. *Weber, supra*.

Based on the lack of evidence to support Harper's claims, the undersigned recommends that Defendants' motion be granted, and this matter dismissed with prejudice.  Alternatively, and considering the testimony and evidence presented by Defendants, the undersigned also recommends that Harper's claims be dismissed with prejudice.

When the plaintiff files a claim under 42 U.S.C. § 1983, he must show that the alleged conduct (1) deprived him of rights, privileges, or immunities guaranteed to him; and (2) was committed by an individual acting under the color of law. *Williams v. Dohm*, 2014-0102, p. 5

(La. App. 1 Cir. 10/14/14); 153 So.3d 542, 546. The plaintiff bears the burden of proving these

elements by a preponderance of the evidence, meaning that he must convince the trier of fact that

his claim is more likely true than not. *Rollins v. Bickham*, 306 Fed.App'x 23, 24 (5th Cir. 2008);

*Thomas v. Fredrick*, 766 F.Supp. 540, 553 (W.D. La. 1991); *Monroe v. Cooper/T. Smith*

*Stevedoring Co., Inc.*, No. 06-933, 2009 WL 1309786, at *5 (M.D. La. May 11, 2009); *see also*

*Matter of Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1164 (5th Cir. 1993) (citation omitted)

("Preponderance" means that it is more likely so, than not so.).

Harper contends that his constitutional rights were violated when Malone allegedly

ordered Rachal to attack Harper and helped him carry out the attack, as well as when Thomas

failed to intervene despite having knowledge of the impending attack. [docs. #1; 29].

### A. Alleged Violation of Harper's Constitutional Rights

Initially, Harper claimed violations of his Eighth Amendment rights. However, at the

time of the incident, Harper was a pretrial detainee, and "'[p]retrial [d]etainees' are not allowed

to file complaints under the 8th Amendment." [doc. #29]. Accordingly, Harper amended his

Complaint to allege violation of his Fourteenth Amendment rights.

The Fifth Circuit has held "that the State owes the same duty under the Due Process

Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with

basic human needs, including . . . protection from harm, during their confinement." Hare v. City

of Corinth, 74 F.3d 633, 650 (5th Cir. 1966). Therefore, "regardless of whether the inmate is a

pretrial detainee or a convicted prisoner, the standard of liability is the same for episodic acts or

omissions of jail officials that expose an innate to being harmed by another inmate." Zweifel v.

Jefferson Par. Corr. Ctr., No. 09-2997, 2009 WL 1459696, at *6 (E.D. La. May 26, 2009). Thus,

the analysis for violation of a plaintiff's Fourteenth Amendment rights is the same as it would be for violation of his Eighth Amendment rights.

The Supreme Court has held that the treatment inmates receive in prison and the conditions under which they are confined are subject to scrutiny under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Specifically, prison officials have a duty to protect inmates from violence at the hands of other inmates. *Id.* at 833. This duty attaches when the prison officials knows that an inmate faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. In other words, the prison official must have the requisite state of mind, which, in prison-conditions cases, is one of "deliberate indifference" to the health or safety of an inmate. *Id.* at 834.

While Harper's allegations that Malone ordered another inmate to attack him would certainly rise to the level of deliberate indifference, if proven, Harper has failed to prove by a preponderance of the evidence that these allegations are true. Harper provides no affirmative evidence to corroborate his theories.  Harper's only evidence that Malone threatened him is his own testimony and that of Sanders, an inmate who had his own grievances against Thomas and Malone.

The evidence was consistent that Harper and Malone had a verbal altercation, but only Harper and Sanders testified that Malone threatened Harper.  The Court does not find their testimony credible in this regard.

Further, even if Malone had made a threat against Harper during their heated exchange, Harper has absolutely no evidence to show that Malone followed through on the alleged threat. Harper speculates that Rachal could not have carried out the attack on him without the help of guards.  Specifically, Harper alleges that this attack could not have occurred without

Malone assisting Rachal in opening the two electronic doors separating him and Harper. [docs. #1; 93]. Harper also suggests that there is no way Rachal could have known that he was in the recreation yard and therefore, fully restrained, without information from Malone (or Thomas). [doc. #93]. However, Harper has not asserted any actual evidence to support these allegations. Harper has not produced evidence that Malone instructed Rachal how to open the doors, nor has he shown anything to indicate that Malone himself tampered with the doors, despite claims that a video of such tampering exists. [doc. #1]. Likewise, Harper failed to produce any witnesses who heard Malone provide this information to Rachal, or evidence that Malone himself admitting to disclosing this information.

On the other hand, at the hearing, Malone and Thomas testified and presented reasonable explanations to counter Harper's sole piece of "evidence" – that without the help of Malone, Rachal could not have carried out the attack in the way he did. Primarily, Malone and Thomas established that many inmates knew how to card prison doors and do so regularly. In her affidavit, Deputy Kaylee Fertal, the guard on duty in the control booth during the fight between Harper and Rachal, explained that in order to carry out the attack, Rachal likely carded his cell door and the door separating D-Seg and A-Seg. [doc. #61-2]. According to Fertal, "[i]t is not unusual for inmates to tamper with locks in order to get them to malfunction." *Id.* In fact, Malone and Thomas testified that Harper himself knows how to card doors, undermining his allegations that there is no way an inmate could open the doors without the help of a prison official. [doc. #93]. Furthermore, Malone and Thomas presented video evidence of the altercation which showed that immediately before Harper was attacked, he was on the far side of a line which runs across the D-Seg floor (the so-called "no go" zone). *Id.*

11

According to testimony by Sargent Michael Taylor, as well as the two Defendants, Harper's position across this line meant Harper was close enough to the door that Rachal could have heard Harper speaking, which would have put Rachal on notice that Harper was not in his cell. *Id.* This testimony established that Rachal could have known Harper was outside of his cell without obtaining this information from a prison official.

Harper simply has not met the burden of proof for a § 1983 claim. Harper has failed to offer any evidence showing that Malone arranged for Rachal to attack him. Rather, he rests his case on a mere hypothesis of what happened and claims that this is evidence which Malone and Thomas have not offered evidence to rebut, ignoring the fact that as the plaintiff, he carries the burden of proof. [doc. 92]. Moreover, Harper is incorrect in his assertions that Malone and Thomas have not presented evidence to dispute his theories. They have offered evidence which reasonably shows that Rachal could have carded the doors himself, without the help of Malone, and that Harper's proximity to the door enabled Rachal to hear him through the door, which would have notified Rachal that Harper was not in his cell. Ultimately, because of the lack of evidence supporting Harper's theories, and the evidence supporting Malone and Thomas's theories undermining Harper's argument, the Court is not persuaded that Harper's claim is more likely true than not. As such, Harper has failed to establish a claim under § 1983.

## B. Compensable Injury Under 42 U.S.C. § 1997e(e)

Additionally, even if Harper could carry his burden of establishing a violation of his civil rights, he has failed to establish that he suffered a compensable injury as a result of the attack on April 18, 2019.

Under 42 U.S.C. § 1997e(e), an imprisoned person may only bring a federal cause of action for an injury suffered while incarcerated if the individual can first show a physical injury

or the commission of a sexual act. 42 U.S.C. § 1997e(e). In construing § 1997e(e), the Fifth

Circuit has found that the plaintiff must show a greater-than-de minimis physical injury, although

it "need not be significant." *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997).

While there is no objective standard for what constitutes a greater-than-de minimis injury,

a survey of Fifth Circuit decisions can help establish the severity required to classify an injury as

non-de minimis. For example, in *Cowart v. Erwin*, 837 F.3d 444, 453-54 (5th Cir. 2016), the

Fifth Circuit found that plaintiff's injuries including a ruptured eardrum, neck sprain, bruising to

his face, and swelling in his right ear, were great-than-de minimis. In *Johnson v. Hankins*, 582

Fed.App'x 306, 308 (5th Cir. 2014), injuries including bruising over the plaintiff's body and

aggravation of a preexisting leg injury which caused plaintiff to limp after the attack were also

determined to be greater than de minimis. On the other hand, a bruised ear for three days was de

minimis. *See Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997); *see also Alexander v.*

*Tippah Cnty, Miss.*, 351 F.3d 626, 631 (5th Cir. 2003) (plaintiffs' vomiting and nausea from

being exposed to raw sewage in their cells was de minimis when they did not seek medical

attention.) Harper complains of multiple physical injuries including bruising, cuts, elevated

heartrate, as well as severe headaches and vision loss which Harper claims is getting worse by

the day. [doc. #9]. These injuries, if traceable to the April 18, 2019 attack would constitute more

than de minimis injuries. *See Luong v. Hatt*, 979 F.Supp. 481, 486 (N.D. Tex. 1997) ("[A]n

appropriate de minimis standard would be whether as a common-sense category approach to the

injury; would the injury require or not require a free world person to visit the emergency room,

or have a doctor attend to, given an opinion, diagnosis and/or medical treatment for the injury?").

However, Harper bears the burden of proving by a preponderance of the evidence that the

injuries were caused by the April 18, 2019 attack. He fails in that regard. The undisputed

13

evidence shows that Harper was involved in a second fight two days later on April 20, 2021.

[docs. #9; 90-1]. While Harper has shown that he sustained injuries, he has not produced

evidence which establish causation-- that his injuries were inflicted during the April 18th fight

versus the April 20th fight, or from some other nonrelated event. [doc. #90-1]. Tellingly,

Harper's medical records note an absence of injury from the April 18th fight. In his chart, the

treating medical provider noted that Harper did not state that he had any injuries, and the

provider did not observe any injuries. *Id.* In fact, the first injury documented in Harper's chart is

from April 20th, where the provider noted a laceration on Harper's arm after he had been

"involved in an altercation." *Id.* In fact, no medical record shows that Harper complained of his

other alleged injuries – high blood pressure, headaches, or loss of vision – until after the second

fight. [doc. #89-1]. For example, Harper's daily blood pressure checks did not begin until April

28th, and he first requested a health services appointment on for his headaches and vision loss on

June 30, 2019. *Id.* While there is documentation to show Harper sustained injuries, this

documentation does not show whether Harper's injuries were a result of the April 18th attack, the

April 20th fight, or a third incident. Without proof that Harper sustained these injuries from the

April 18th attack, he cannot meet his burden to show that his injuries are a result of the conduct

for which he is pursuing a § 1983 claim.

Finally, to the extent that Harper alleges in his trial brief that he is not required to prove a

physical injury to satisfy § 1983, he is incorrect.  Harper cites *Siggers-El v. Barlow*, 433

F.Supp.2d 811 (E.D. Mich. 2006), a district case arising out of the Eastern District of Michigan,

for the proposition that the very violation of an inmate's constitutional rights constitutes an

injury, and, thus, inmates need not show a physical injury under § 1983. [doc. #92]; However,

this reading of *Siggers* is incorrect. *Siggers* does not stand for the notion that a violation of an

inmate's constitutional rights satisfies the physical injury requirement under § 1997e(e); rather, the *Siggers* Court held that mental or emotional damages may satisfy § 1997e(e)'s physical injury in cases involving a violation of an inmate's *First Amendment* rights. *Id.* at 816. The Court reasoned that because First Amendment violations rarely result in physical injuries, requiring an inmate to show a physical injury for a First Amendment violation would "allow 'prison officials to violate inmate First Amendment rights with impunity, resolute with the knowledge' that First Amendment violations will almost never result in physical injuries." *Id.* at 816 (quoting *Percival v. Rowley*, 02-cv-363, 2005 WL 2572034, at *3 (W.D. Mich. Oct. 12, 2005). Here, in contrast with the *Siggers* Plaintiff, Harper is asserting a Fourteenth Amendment violation, and he is required by statute to prove a physical injury.

### IV.  CONCLUSION

For the above-assigned reasons,

IT IS RECOMMENDED that Defendants' oral motion on partial findings be GRANTED,  and Plaintiff's claims be DISMISSED WITH PREJUDICE because he has failed to establish a constitutional violation or that such violation caused him to suffer a compensable injury.  In the alternative, it is recommended, based on the entire record of the evidentiary hearing, that judgment be entered in favor of Defendants and against Plaintiff and that Plaintiff's claims be DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or

response for extension of time shall be furnished to the District Judge at the time of filing.

Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS ON PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

MONROE, LOUISIANA, this 18th day of January, 2022.


_____
KAYLA D. MCCLUSKY
UNITED STATES MAGISTRATE JUDGE